UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| MARVONTE WILSON and DOMONIQUE DANIELS, individually and on behalf of all others similarly situated, | No. 2:23-cv-00172 WBS KJN |
| Plaintiffs, | MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION TO DISMISS |
| v. | |
| TIMEC SERVICES COMPANY, INC.; FERROVIAL SERVICES INFRASTRUCTURE, INC.; VALERO REFINING COMPANY-CALIFORNIA; DISA GLOBAL SOLUTIONS; and DOES 1 through 50, inclusive, | |
| Defendants. | |

----oo0oo----

Plaintiffs Marvonte Wilson and Domonique Daniels brought this putative class action in Solano County Superior Court against Timec Services Company, Inc. ("Timec"); Ferrovial Services Infrastructure, Inc. ("Ferrovial"); Valero Refining Company-California ("Valero"); and DISA Global Solutions ("DISA").  Plaintiffs allege employment discrimination based on

1

1  race in violation of Title VII of the Civil Rights Act of 1964

2  ("Title VII"), 42 U.S.C. § 2000e, and the California Fair

3  Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940; race

4  discrimination in violation of 42 U.S.C. § 1981; employment

5  discrimination based on perceived disability in violation of the

6  Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a);

7  and negligence under California law.  (First Am. Compl ("FAC")

8  (Docket No. 14).)  Defendant DISA now moves to dismiss the

9  complaint, joined in part by defendants Timec, Valero, and

10  Ferrovial.  (Docket Nos. 22, 24, 25, 26.)

11  I.   Factual Background[1]

12       Defendants Timec, Ferrovial, and Valero are businesses

13  in the refinery industry.  (FAC ¶¶ 8-9.)  At all relevant times,

14  Ferrovial owned Timec.[2]  (Id. ¶ 8.)

15       DISA is a drug-testing company providing services to

16  hundreds of employers in the refining, chemical, and

17  petrochemical industries, including defendants Timec/Ferrovial

18  and Valero.  (Id. ¶ 17.)  DISA operates the DISA Contractor's

19  Consortium ("DCC"), an online platform that provides information

20  about whether employees are compliant with DISA's drug-testing

21  policies.  (See id.)  When an employee fails to comply with

22  DISA's drug-testing policies, he or she is designated as

23  "inactive" on DCC.  (Id.)  To regain "active" status, employees

24  must pay DISA to either take a retest or complete a substance

25

26       [1]   All facts recited herein are as alleged in the
Complaint unless otherwise noted.

27

28       [2]   The court will refer to Timec and Ferrovial as
"Timec/Ferrovial."

1   abuse course.  (Id.)

2          DISA uses a variety of drug-testing methods, including

3   urine, blood, and hair testing.  Hair tests cannot detect drug

4   usage that occurred approximately five to seven days prior to the

5   test, but can detect earlier drug usage.  (See id. ¶¶ 15-16.)

6   DISA claims that hair testing can detect "repeat drug use up to a

7   90-day window."  (Id. ¶ 16.)

8          Hair testing is less effective on melanin-rich, or

9   darker, hair.  (Id. ¶ 14.)  As a result, samples of melanin-rich

10  hair -- a feature black people commonly have -- are at a higher

11  risk of false positive test results than samples of lighter

12  colored hair.  (Id.)  Despite these known issues, DISA advertises

13  its hair testing as an accurate indicator of drug use.  (Id. ¶¶

14  16-17.)

15         Plaintiffs Marvonte Wilson and Domonique Daniels are

16  black men.  (Id. ¶¶ 18, 33.)  Mr. Wilson was employed by

17  Timec/Ferrovial from 2016 to 2019.  (Id. ¶ 18.)  Mr. Daniels was

18  employed by Timec/Ferrovial from 2001 to 2019.  (Id. ¶ 33.)

19  Through contracts with Valero, Timec/Ferrovial placed plaintiffs

20  at Valero's work sites.  (Id. ¶¶ 19, 34.)  Valero required

21  multiple types of drug tests, including hair tests, to be

22  administered by DISA.  (See id. ¶¶ 20, 35.)

23         In January and February 2019, respectively, Mr. Daniels

24  and Mr. Wilson received positive hair test results for

25  methamphetamines and cocaine, respectively, despite never having

26  used those drugs.  (Id. ¶¶ 23, 37.)  Mr. Daniels also received

27  saliva and urine tests, which both came back negative for all

28  drugs.  (Id. ¶ 37.)  Mr. Wilson received a urine test, which came

back negative for all drugs.  (Id. ¶ 23.)  As a result of the false positive hair tests, DISA classified plaintiffs as "inactive" on the DCC platform.  (Id. ¶¶ 28, 39.)  When plaintiffs notified DISA that the results were false positives, DISA informed plaintiffs that they had two options: pay $175 for a retest of the same hair sample by DISA, or complete a substance abuse course administered by DISA at a cost ranging from $600 to $850.  (Id. ¶¶ 24, 37.)  Plaintiffs informed Timec/Ferrovial that the results were false positives, but Timec/Ferrovial told plaintiffs that they had to resolve the issue with DISA.  (Id. ¶¶ 24, 38.)

Mr. Wilson was terminated by Valero and informed that he could not return to work for Timec/Ferrovial until he regained active status.  (Id. ¶ 24.)  A retest of Mr. Wilson's original sample again came back with a false positive.  (Id. ¶ 27.)  Mr. Wilson refused to take the substance abuse course and did not again work for Timec/Ferrovial or Valero.  (Id. ¶ 28.)

Mr. Daniels inquired repeatedly with DISA about receiving a retest, but by the time DISA responded, the deadline for retesting had passed.  (Id. ¶ 39.)  During the time he was designative "inactive," Mr. Daniels was not allowed to work for either Timec/Ferrovial or Valero.  (Id.)  Mr. Daniels ultimately paid for and completed DISA's substance abuse course to regain his active status on DCC.  (Id.)  However, the jobs he subsequently received were lower-ranking and paid less than his previous employment.  (Id. ¶ 40.)

II.  Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows for

4

1   dismissal when a complaint fails to state a claim upon which

2   relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  "A Rule

3   12(b)(6) motion tests the legal sufficiency of a claim."  Navarro

4   v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  The inquiry before

5   the court is whether, accepting the allegations in the complaint

6   as true and drawing all reasonable inferences in the plaintiff's

7   favor, the complaint has alleged "sufficient facts . . . to

8   support a cognizable legal theory," id., and thereby stated "a

9   claim to relief that is plausible on its face," Bell Atl. Corp.

10  v. Twombly, 550 U.S. 544, 570 (2007).

11       Courts are not, however, "required to accept as true

12  allegations that are merely conclusory, unwarranted deductions of

13  fact, or unreasonable inferences."  Sprewell v. Golden State

14  Warriors, 266 F.3d 979, 988 (9th Cir. 2001); see Bell Atl. Corp.,

15  550 U.S. at 555.  Accordingly, "for a complaint to survive a

16  motion to dismiss, the non-conclusory 'factual content,' and

17  reasonable inferences from that content, must be plausibly

18  suggestive of a claim entitling the plaintiff to relief."  Moss

19  v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quoting

20  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

21  III. Defendant DISA

22       A.   Employment Under Title VII, FEHA, and ADA

23       DISA argues that the Title VII, FEHA, and ADA claims

24  should be dismissed because plaintiffs have failed to establish

25  that DISA was plaintiffs' "employer" and that DISA subjected them

26  to adverse employment actions.  Plaintiffs argue that DISA was

27  plaintiffs' indirect employer and that the "inactive"

28  designations on DISA's platform constituted adverse employment

actions.

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a).  The FEHA makes it an "unlawful employment practice, unless based upon a bona fide occupational qualification," to "discriminate against the person in compensation or in terms, conditions, or privileges of employment" on the basis of, <u>inter alia</u>, race, color, or national origin.  <u>See</u> Cal. Gov. Code § 12940.  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

1.   <u>Indirect Employer</u>

The applicable provisions of Title VII, the FEHA, and the ADA "predicate potential liability on the status of the defendant as an 'employer.'"  <u>See</u> <u>Mayfield v. County of Merced</u>, No. 1:13-cv-01619 LJO, 2014 WL 5822913, at *3 (E.D. Cal. Nov. 10, 2014) (Title VII and FEHA); <u>Buchanan v. Watkins & Letofsky, LLP</u>, 30 F.4th 874, 877 (9th Cir. 2022) (ADA).  Thus, plaintiffs must plausibly allege that they were "employees" of DISA.

In establishing an employment relationship, "the connection with employment need not necessarily be direct."

1  Lutcher v. Musicians Union Loc. 47, 633 F.2d 880, 883 (9th Cir.

2  1980).  A defendant can be held liable as an "indirect employer"

3  where it acted in a discriminatory manner to "interfere" with the

4  plaintiff's direct employment and "had some peculiar control over

5  the employee's relationship with the direct employer."  Anderson

6  v. Pac. Mar. Ass'n, 336 F.3d 924, 932 (9th Cir. 2003).  The

7  defendant must have exercised "actual '[c]ontrol over access to

8  the job market'" and "considerable power over [employees']

9  ability to form employment relationships with third parties."

10 See Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572,

11 581 (9th Cir. 2000) (quoting Sibley Mem'l Hosp. v. Wilson, 488

12 F.2d 1338, 1341 (D.C. Cir. 1973)).[3]

13         If it were alleged that DISA only administered drug

14 tests, the FAC might not have sufficiently alleged that DISA

15 performed an action that controlled access to the job market.

16 See Ass'n of Mexican-Am. Educators, 231 F.3d at 583 ("Title VII

17 does not apply when the only connection among the licensing

18 agency, the plaintiff, and the universe of prospective employers

19 is the agency's implementation of a general licensing

20 examination.") (emphasis added).  However, plaintiffs allege that

21

22         [3]   The "indirect employment" analysis applies equally in
   the Title VII, FEHA, and ADA contexts.  See Orosa v. Therakos,
23 Inc., No. 11-cv-2143 EMC, 2011 WL 3667485, at *3 (N.D. Cal. Aug.
   22, 2011) (analyzing indirect employment in context of FEHA
24 claim); Vernon v. California, 116 Cal. App. 4th 114, 126, 130
   (1st Dist. 2004) (cited with approval in Doe I v. Wal-Mart
25 Stores, Inc., 572 F.3d 677, 682 (9th Cir. 2009)) (applying 9th
   Circuit Title VII case law on indirect employment doctrine to
26 FEHA claim); Walsh v. Nev. Dep't of Hum. Res., 471 F.3d 1033,
   1038 (9th Cir. 2006) ("Title I of the ADA adopts a definition of
27 'employer' and a remedial scheme that is identical to Title
   VII").

28

DISA did more than merely administer tests.  DISA allegedly created a set of policies that employees who received positive drug test results were required to follow in order to maintain "active" standing on DISA's online platform, which DISA held out to an entire industry as an accurate characterization of employees' drug use or lack thereof.

Plaintiffs allege that pursuant to DISA's policies, those who tested positive -- even where there was reason to believe the test results were false positives, or where other test types came back negative -- had to pay DISA for either a retest of the same sample or a substance abuse course.  (See FAC ¶¶ 24, 37.)  DISA allegedly refused employees' requests to take a second test of a new hair sample, even though DISA claims that hair tests can detect drug use that occurred weeks or even months prior and therefore would likely return another positive result if the employee had actually used drugs.  (See id. ¶¶ 16, 24.)  Plaintiff Wilson even acquired a second hair test by a different lab, which came back negative, but DISA refused to consider it.  (Id. ¶¶ 26-27.)  Plaintiffs tried to communicate their concerns over false positive results with their direct employer, Timec/Ferrovial, but were told that Timec/Ferrovial were unable to provide any resolution; plaintiffs' only option was to comply with DISA's requirement of either a retest or a substance abuse course.  (See id. ¶¶ 24, 38.)

Notably, plaintiffs allege that they the hair tests for only one specific employer, Valero.  (See id. ¶¶ 20, 35.)  Rather than merely communicating that plaintiffs were not compliant with Valero's hair test requirement, DISA declared plaintiffs

1  "inactive," which affected their ability to work for <u>all</u>

2  employers contracted with DISA -- presumably including employers

3  that did not require hair tests at all.  (See <u>id.</u> ¶ 17.)

4  Assuming the truth of plaintiff's allegations, DISA reached out

5  into an entire industry to convey plaintiffs' inactive status,

6  thereby interfering with plaintiffs' employment opportunities

7  with hundreds of potential employers.  Rather than merely

8  administering drug tests, it is alleged that DISA devised its own

9  set of policies that employees industry-wide had to comply with

10  to be eligible to work for hundreds of potential employers.  <u>See</u>

11  <u>Sibley</u>, 488 F.2d at 1342 (control over access to direct employers

12  "for purposes of the initiation of . . . employment" brought

13  defendant "within the strictures of Title VII").

14       Accordingly, plaintiffs have sufficiently pled that

15  defendant DISA was their indirect employer under Title VII, the

16  FEHA, and the ADA.

17       2.  <u>Adverse Employment Action</u>

18       To state claims of discrimination under Title VII, the

19  FEHA, and the ADA, plaintiffs must allege that defendant

20  subjected them to adverse employment actions.  <u>See</u> <u>Davis v. Team</u>

21  <u>Elec. Co.</u>, 520 F.3d 1080, 1093-94 (9th Cir. 2008) (Title VII);

22  <u>Flores v. City of Westminster</u>, 873 F.3d 739, 748 (9th Cir. 2017)

23  (FEHA); <u>Pardi v. Kaiser Found. Hosps.</u>, 389 F.3d 840, 849 (9th

24  Cir. 2004) (ADA).  An adverse employment action is one that

25  materially affects the terms, conditions, or privileges of

26  employment.  <u>See</u> <u>Davis</u>, 520 F.3d at 1089 (Title VII); <u>Yanowitz v.</u>

27  <u>L'Oreal USA, Inc.</u>, 36 Cal. 4th 1028, 1036 (Cal. 2005) (FEHA);

28  <u>Weeks v. Union Pac. R.R. Co.</u>, 137 F. Supp. 3d 1204, 1216-17 (E.D.

1  Cal. 2015) (citing <u>Jefferson v. Time Warner Cable Enters. LLC</u>,

2  584 F. App'x 520, 522 (9th Cir. 2014)) (ADA).

3          Plaintiffs allege that DISA's classification of

4  plaintiffs as "inactive" on DISA's online platform constituted

5  adverse employment actions.  Defendant DISA argues that only the

6  subsequent actions taken by Timec/Ferrovial and Valero qualify as

7  adverse employment actions, though it cites no authority

8  supporting this position.

9          Plaintiffs allege that as a direct result of their

10  placement on "inactive" status on DISA's platform, they were

11  allegedly terminated by Valero and suspended from new assignments

12  by Timec/Ferrovial.  (<u>See</u> FAC ¶¶ 24, 39.)  The inactive status

13  thus led to a change in the terms, conditions, or privileges of

14  employment.  <u>See</u> <u>Kang v. U. Lim Am.</u>, Inc., 296 F.3d 810, 819 (9th

15  Cir. 2002) (termination constitutes change in terms and

16  conditions of employment); <u>Raad v. Fairbanks N. Star Borough Sch.</u>

17  <u>Dist.</u>, 323 F.3d 1185, 1196 (9th Cir. 2003), <u>opinion amended on</u>

18  <u>denial of reh'g</u>, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8,

19  2003) (suspension constitutes adverse employment action).  That

20  DISA did not directly carry out the suspensions or terminations

21  occasioned by its actions does not absolve it of potential

22  liability; the placement on inactive status can constitute an

23  independent adverse employment action.

24          Plaintiffs allege that maintenance of "active" status

25  is a necessary precondition for employment at Timec/Ferrovial,

26  Valero, and hundreds of other employers in the refining industry.

27  Some courts have found that interference with a prerequisite for

28  employment (such as licensing or training) can constitute an

1   adverse employment action.  For instance, in <u>Bastidas v. Good</u>
2   <u>Samaritan Hospital LP</u>, a hospital failed to take action to
3   correct an inaccurate notion on a physician's online professional
4   profile.  No. 13-cv-04388 SI, 2016 WL 1029465, at *6 (N.D. Cal.
5   Mar. 15, 2016).  The profile erroneously described him as
6   "incompetent" based on the hospital's representations to the
7   third-party company maintaining the website.  <u>Id.</u>  The court
8   concluded that the hospital's omission constituted an adverse
9   employment action because the inaccurate online profile "affects
10  licensing and professional privileges until such time as it is
11  remedied" and thereby affects the terms, conditions, or
12  privileges of the physician's employment.  <u>Id.</u>  Similarly to the
13  physician's online profile in <u>Bastidas</u>, plaintiffs' DCC profiles
14  reflecting "inactive" status affected their professional
15  privileges and ability to maintain employment.

16        Other cases have found that denial of training
17  constitutes an adverse employment action where that training is a
18  prerequisite for employment opportunities.  <u>See</u> <u>Nelsen v. McHugh</u>,
19  No. 3:08-CV-1424-ST, 2011 WL 3439190, at *3 (D. Or. Aug. 5,
20  2011); <u>Wheeler v. Chertoff</u>, No. C 08-1738 SBA, 2009 WL 2157548,
21  at *6 (N.D. Cal. July 17, 2009).  As where an employer interferes
22  with the licensure or training an employee needs to work, DISA
23  allegedly interfered with the drug test compliance status that
24  plaintiffs required to maintain employment.

25        Another line of cases indicates that where an
26  investigation, evaluation, or accusation is factually unfounded,
27  it can constitute an adverse employment action if it affects the
28  terms, conditions, or privileges of employment.  <u>See</u> <u>Kortan v.</u>

11

1  Cal. Youth Auth., 217 F.3d 1104, 1113 (9th Cir. 2000) (undeserved

2  negative performance evaluation can constitute adverse employment

3  action if disseminated, leading to changes to the terms,

4  conditions, or privileges of employment); Sanchez v. City of

5  Santa Ana, 915 F.2d 424, 431 (9th Cir. 1990) (unfounded negative

6  evaluations that led to denial of merit pay constituted

7  constructive discharge); Washington v. Cal. City Corr. Ctr., No.

8  1:10-cv-02031 AWI, 2012 WL 2577557, at *4–5 (E.D. Cal. July 3,

9  2012) (false accusation of misconduct could constitute adverse

10 employment action for FEHA discrimination claim); Plymale v. City

11 of Fresno, No. 09-cv-0802 LJO DLB, 2009 WL 1810765, at *5 (E.D.

12 Cal. June 25, 2009) (discriminatory investigation that resulted

13 in termination constituted adverse employment action).  Similarly

14 to the false evaluations and accusations in these cases, placing

15 plaintiffs on "inactive" status based on false drug test results

16 affected the terms, conditions, and privileges of their

17 employment and can therefore qualify as adverse employment

18 actions.

19      Accordingly, plaintiffs have sufficiently alleged that

20 defendant DISA carried out adverse employment actions as required

21 to state a claim under Title VII, the FEHA, and the ADA.

22      B.   Timeliness of Negligence Claim

23      There is a two-year statute of limitations for

24 negligence claims under California law.  Cal. Civ. Proc. Code §

25 335.1.  Plaintiffs argue that although the negligence claim was

26 filed outside that period, the statute of limitations is subject

27 to equitable tolling.

28      Equitable tolling is a judicially created doctrine that

suspends or extends the statute of limitations period.  See
McDonald v. Antelope Valley Cmty. Coll. Dist., 45 Cal. 4th 88, 99
(Cal. 2008).  It is designed to prevent unjust forfeitures of a
right to trial when there has been timely notice to defendants of
plaintiff's claims.  Id.  California's equitable tolling doctrine
applies, inter alia, "when an injured person has several legal
remedies and, reasonably and in good faith, pursues one."  Elkins
v. Derby, 12 Cal. 3d 410, 414 (Cal. 1974).  Its application in
such circumstances is meant to ease pressures on parties seeking
redress in multiple forums and to encourage parties to pursue
informal remedies.  See McDonald, 45 Cal. 4th at 100.  Equitable
tolling has three requirements: (1) timely notice to defendants;
(2) lack of prejudice to defendants; and (3) reasonable and good
faith conduct on the part of the plaintiffs.  See Addison v.
California, 21 Cal. 3d 313, 319 (Cal. 1978); Cervantes v. City of
San Diego, 5 F.3d 1273, 1275 (9th Cir. 1993).

          "'A motion to dismiss based on the running of the
statute of limitations period may be granted only if the
assertions of the complaint, read with the required liberality,
would not permit the plaintiff to prove that the statute was
tolled.'"  Sosa v. Hulse, No. 1:19-cv-01333 EPG PC, 2021 WL
289377, at *6 (E.D. Cal. Jan. 28, 2021), report and
recommendation adopted, 2021 WL 859375 (E.D. Cal. Mar. 8, 2021)
(quoting Supermail Cargo, Inc. v. United States, 68 F.3d 1204,
1206-07 (9th Cir. 1995)).  See also Huynh v. Chase Manhattan
Bank, 465 F.3d 992, 1003-04 (9th Cir. 2006) ("Generally, the
applicability of equitable tolling depends on matters outside the
pleadings, so it is rarely appropriate to grant a Rule 12(b)(6)

1  motion to dismiss (where review is limited to the complaint) if

2  equitable tolling is at issue."). Thus, the question here is

3  whether plaintiffs pled sufficient facts such that they could

4  ultimately prove the statute was tolled.

5      Given that many of the same facts underlie the

6  negligence and discrimination claims (see FAC ¶¶ 60-124), it is

7  possible that the claims are "at least so similar that the

8  defendant[s'] investigation of the [administrative claims] will

9  put [them] in a position to fairly defend" the negligence claim

10  such that equitable tolling applies. See Cervantes, 5 F.3d at

11  1276. See also Rosas v. Chipotle Mexican Grill, Inc., No. 1:22-

12  cv-189 JST RNB, 2013 WL 12170553, at *4 (C.D. Cal. Sept. 9, 2013)

13  (concluding negligence claim was subject to equitable tolling

14  because it "[arose] out of the same factual allegations" as the

15  plaintiff's Title VII and FEHA claims, which plaintiff had

16  administratively exhausted and thereby given defendants adequate

17  notice). Accordingly, the court will deny the motion to dismiss

18  the negligence claim.

19  IV.  All Defendants

20      A.   Section 1981

21      Section 1981 states, in relevant part, "[a]ll persons

22  within the jurisdiction of the United States shall have the same

23  right in every State and Territory to make and enforce

24  contracts." 42 U.S.C. § 1981(a). "To state a claim under §

25  1981, a plaintiff must identify an impaired 'contractual

26  relation,' by showing that the intentional racial discrimination

27  prevented the creation of a contractual relationship or impaired

28  an existing contractual relationship." Jackson v. Farmers Ins.

14

Exch., No. 2:12-cv-01020 WBS, 2012 WL 5337076, at *3 (E.D. Cal. Oct. 26, 2012) (quoting Boyd v. Feather River Cmty. Coll. Dist., No. 2:11-cv-0231 JAM EFB, 2011 WL 5024547, at *4 (E.D. Cal. Oct. 20, 2011)).

To state a claim under § 1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020).[4]

Plaintiffs' § 1981 claim is premised on the inaccuracy of hair drug tests on "melanin-rich hair."  (See Opp'n at 25; FAC ¶¶ 1, 104.)  While black people tend to have hair with more melanin, dark hair is a trait seen across people of all races, including white people.  Although physical traits can act as a proxy for race, hair color alone is insufficient because it is "shared by many not of [plaintiffs'] race or belonging to any racial minority."  See Tolbert v. Gomez, 190 F.3d 985, 989 (9th Cir. 1999) (where beliefs of prospective juror subject to allegedly race-based peremptory challenge were shared by people of all races, those beliefs could not be considered a "proxy" for race); Johnson v. Sutton, No. 2:17-cv-00958 KJM ACP, 2022 WL 2134956, at *15 (E.D. Cal. June 14, 2022), report and recommendation adopted, 2022 WL 3579871 (E.D. Cal. Aug. 19, 2022) (same).  Cf. Yoshimoto v. O'Reilly Auto., Inc., No. C 10-5438

---

[4]   The court notes that Title VII has a different causation standard than § 1981.  Under Title VII, race must only be a "motivating factor" for the adverse employment action, which is a lower standard than but-for causation.  See Comcast, 140 S. Ct. at 1017.  Defendants did not raise the issue of causation on plaintiffs' other claims.

1 | PJH, 2013 WL 6446249, at *11 (N.D. Cal. Dec. 9, 2013) (derogatory
2 | comments about plaintiff's white hair were evidence of age
3 | discrimination).  See also McCleskey v. Kemp, 481 U.S. 279, 341
4 | (1987) (Brennan, J., dissenting) ("One could hardly contend that
5 | this Nation has on the basis of hair color inflicted upon persons
6 | deprivation comparable to that imposed on the basis of race.").[5]

7 |        Further, plaintiffs do not allege that black employees
8 | with dark hair were treated differently than other employees with
9 | dark hair.  And assuming the truth of plaintiffs' allegations, it
10 | seems likely that white employees with dark hair were also
11 | subject to an increased rate of false positive drug test results.
12 | See Pac. Shores Properties, LLC v. City of Newport Beach, 730
13 | F.3d 1142, 1159 (9th Cir. 2013) (noting that "a plaintiff [may]
14 | raise an inference of discrimination by identifying a similarly
15 | situated entity who was treated more favorably"); Frazier v. City
16 | of Fresno, No. 1:20-cv-01069 DAD SAB, 2022 WL 1128991, at *11
17 | (E.D. Cal. Apr. 15, 2022) (dismissing § 1981 claim because
18 | plaintiff failed to allege that similarly situated non-minority
19 | individuals were treated more favorably and therefore failed to
20 | plead that race was but-for cause of injury).

21 |        [5]   This is not to say that hair-related characteristics
22 | can never form the basis of race discrimination claims.  See
   | Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 168
23 | (7th Cir. 1976) (en banc) (recognizing a claim for racial
   | discrimination based on the plaintiff's allegation that she was
24 | denied a promotion because she wore her hair in a natural Afro);
   | Haymon v. Metra, No. 18 C 848, 2020 WL 1548953, at *12 (N.D. Ill.
25 | Mar. 31, 2020) ("there is no question that racial discrimination
   | claims by Black women on the basis of their hair texture . . .
26 | are viable"); Cornwell v. California Bd. of Barbering &
   | Cosmetology, 962 F. Supp. 1260, 1276 n.13 (S.D. Cal. 1997)
27 | (noting that people of African descent have a unique hair
28 | texture).

1   The court therefore concludes that plaintiffs have not

2   adequately pled that race was a but-for cause of the false

3   positive test results or any resulting actions, including DISA

4   listing them as inactive on DCC, Timec/Ferrovial suspending their

5   job site placements, or Valero terminating their employment.

6   Plaintiffs have thus failed to state a claim under § 1981.

7   Accordingly, plaintiffs' § 1981 claim will be dismissed in its

8   entirety.[6]

9       B.   ADA Claim Based on Perceived Disability

10  The ADA prohibits covered entities from

11  "discriminat[ing] against a qualified individual on the basis of

12  disability in regard to job application procedures, the hiring,

13  advancement, or discharge of employees, employee compensation,

14  job training, and other terms, conditions, and privileges of

15  employment."  42 U.S.C. § 12112(a).  A person with a "disability"

16  is defined to include an individual who is "regarded as having"

17  an impairment.  42 U.S.C. § 12102(1)(C).  "An individual meets

18  the requirement of 'being regarded as having such an impairment'

19  if the individual establishes that he or she has been subjected

20  to an action prohibited under [the ADA] because of an actual or

21  perceived physical or mental impairment whether or not the

22  impairment limits or is perceived to limit a major life

23  activity."  Id. § 12102(3)(A).

24  "The term 'qualified individual with a disability' does

25  'not include any employee or applicant who is currently engaging

26

27  _____

        [6]   Though it does not reach the issue, the court notes
    that a claim under § 1981 also requires "proof of intentional
    discrimination."  Gen. Bldg. Contractors Ass'n, Inc. v.

28  Pennsylvania, 458 U.S. 375, 376 (1982).

17

1  in the illegal use of drugs, when the covered entity acts on the
2  basis of such use.'"  <u>Collings v. Longview Fibre Co.</u>, 63 F.3d
3  828, 831 (9th Cir. 1995) (quoting 42 U.S.C. § 12114(a)).  "The
4  ADA does, however, protect individuals . . . who are erroneously
5  regarded as using drugs when in fact they are not."  <u>Id.</u> at 831-
6  32 (citing 42 U.S.C. § 12114(b)).  In such cases, "a plaintiff
7  must show that the employer knew that the employee had an actual
8  impairment or perceived the employee to have an impairment, and
9  that the impairment was not transitory or minor."  <u>Equal Emp.</u>
10  <u>Opportunity Comm'n v. BNSF Ry. Co.</u>, 902 F.3d 916, 923 (9th Cir.
11  2018), <u>as amended</u> (Sept. 12, 2018).  The term impairment is
12  "construe[d] . . . broadly," <u>id.</u>, and includes drug addiction,
13  <u>see</u> <u>Thompson v. Davis</u>, 295 F.3d 890, 896 (9th Cir. 2002).

14          In claiming that defendants engaged in disability
15  discrimination due to false positive drug test results,
16  plaintiffs must allege sufficient facts to conclude that
17  defendants took the adverse employment actions "because
18  [plaintiffs] were addicts or because it perceived they were
19  addicts . . . ."  See <u>Jones v. City of Bos.</u>, 752 F.3d 38, 58 (1st
20  Cir. 2014); <u>see also</u> <u>Hernandez v. Hughes Missile Sys. Co.</u>, 362
21  F.3d 564, 568 (9th Cir. 2004) (in regarded-as claim by former
22  employee with history of substance abuse, trier of fact must
23  determine whether employer's failure to re-hire was due to
24  employer's knowledge of the plaintiff's "status as an [addict]").

25          In arguing that DISA discriminated against them based
26  on perceived addiction, plaintiffs rely on a statement on DISA's
27  website that its hair tests are able to "detect repeat drug use
28  up to a 90-day window," and DISA's general policy of offering a

1  substance abuse course as one option for employees who test
2  positive.  (See Opp'n at 21-22; FAC ¶ 111.)  Plaintiffs do not
3  provide any additional facts in support of their allegation that
4  Timec, Ferrovial, and Valero, perceived plaintiffs as addicts;
5  rather, they merely state that these defendants "adopt[ed] and
6  rel[ied] upon . . . DISA's false positive results as valid."
7  (See FAC ¶ 112.)  An advertising statement concerning what the
8  tests may be able to do and the generally applicable course
9  policy, without more, are not sufficient to establish that any of
10 the defendants actually perceived plaintiffs as repeat users --
11 let alone addicts -- based on a single positive test.  Cf.
12 Hernandez, 362 F.3d at 564, 568-69 (trier of fact could find that
13 employer perceived employee as an addict based on knowledge that
14 employee had previously completed an addiction treatment program
15 and a letter indicating that employee was attending Alcoholics
16 Anonymous).

17      Plaintiffs have therefore failed to sufficiently allege
18 that defendants perceived them as having drug addictions.
19 Accordingly, the court will dismiss the ADA claim in its
20 entirety.

21      C.   Administrative Exhaustion

22      Under Title VII and the FEHA, "a plaintiff must exhaust
23 her administrative remedies by filing a timely charge with the
24 EEOC, or the appropriate state agency, thereby affording the
25 agency an opportunity to investigate the charge."  See B.K.B. v.
26 Maui Police Dep't, 276 F.3d 1091, 1099 (9th Cir. 2002), as
27 amended (Feb. 20, 2002) (citing 42 U.S.C. § 2000e-5(b)) (Title
28 VII); Rodriguez v. Airborne Express, 265 F.3d 890, 896 (9th Cir.

1   2001) (FEHA).  "The scope of the written administrative charge

2   defines the permissible scope of the subsequent civil action,"

3   which must be "like or reasonably related to" the administrative

4   claims.  Rodriguez, 265 F.3d at 897 (FEHA); see also Sommatino v.

5   United States, 255 F.3d 704, 708 (9th Cir. 2001) (Title VII).

6   "This standard is met where the allegations in the civil suit are

7   within the scope of the administrative investigation which can

8   reasonably be expected to grow out of the charge of

9   discrimination."  Rodriguez, 265 F.3d at 897 (internal quotation

10  marks omitted); see also Sommatino, 255 F.3d at 708.  In

11  determining whether the plaintiffs have exhausted their

12  administrative remedies, "employment discrimination charges are

13  to be construed with the utmost liberality."  Paige v.

14  California, 102 F.3d 1035, 1041 (9th Cir. 1996) (internal

15  quotation marks omitted).

16          Plaintiffs filed charges of discrimination against

17  defendants with the Equal Employment Opportunity Commission

18  ("EEOC") and California Department of Fair Employment and Housing

19  ("DFEH") in 2019.  (FAC ¶ 13.)  Defendants argue that plaintiffs

20  nonetheless failed to administratively exhaust their class and

21  disparate impact claims because they did not raise them in their

22  administrative complaints.

23          As to Timec, Ferrovial, and Valero, this argument is

24  factually lacking in merit; each of plaintiffs' administrative

25  complaints against them explicitly referred to multiple other

26  employees of the same race who suffered similar harms, and

27  alleged that defendants "unlawfully discriminated against me and

28  have a disparate impact upon a similarly-situated class of

1   African-American applicants and returning employees."  (See

2   Docket No. 28-1 at 8, 16 (emphasis added).)  Accordingly,

3   plaintiffs' class and disparate impact claims could reasonably be

4   expected to grow out of their administrative charges against

5   Timec, Ferrovial, and Valero.  See Rodriguez, 265 F.3d at 897.

6           The administrative charges against DISA do not

7   explicitly identify disparate impact and class claims.  However,

8   that level of specificity is not required.  In Paige v.

9   California, the Ninth Circuit held that the plaintiff had

10  administratively exhausted her class action claims on a theory of

11  disparate impact, despite the fact that the underlying

12  administrative charge alleged only "discrimination" against the

13  plaintiff.  102 F.3d at 1041-43.  The Ninth Circuit reasoned,

14  "even if neither the EEOC nor the [state] charges on their face

15  explicitly alleged class discrimination, it is plain that an EEOC

16  investigation of class discrimination on the basis of race could

17  reasonably be expected to grow out of" an individual allegation

18  of discrimination.  Id. at 1042.  See also Arizona v. Geo Grp.,

19  Inc., 816 F.3d 1189, 1204 (9th Cir. 2016) ("an employer may be on

20  notice of classwide allegations of discrimination from a single

21  charge"); Brown v. Coach Stores, 163 F.3d 706, 712 (2d Cir. 1998)

22  (plaintiff's "disparate impact claim reasonably related to her

23  failure to promote claim as we would expect that the EEOC, in

24  investigating the complaint, would have assessed [the employer's]

25  promotion policies and their effect on minority employees").  As

26  in Paige, an investigation into claims of disparate impact on a

27  class of employees could reasonably be expected to grow out of

28  plaintiffs' charges of discrimination.

1    The court therefore concludes that plaintiffs satisfied

2  the administrative exhaustion requirements.

3    D.    Timeliness of Title VII and FEHA Claims

4    Defendants argue that plaintiffs' Title VII, FEHA, and

5  ADA claims are time-barred.  The court will address the

6  timeliness of the remaining Title VII and FEHA claims.

7    1.    Title VII Claims

8    A plaintiff has ninety days from the receipt of a

9  right-to-sue notice letter[7] to initiate a Title VII lawsuit.

10 Payan v. Aramark Mgmt. Servs. Ltd. P'ship, 495 F.3d 1119, 1121

11 (9th Cir. 2007) (citing 42 U.S.C. § 2000e-5(f)(1)).  The lawsuit

12 will be time-barred if not filed within the ninety-day period.

13 Id.  The limitations period starts on "the date on which a right-

14 to-sue notice letter arrived at the claimant's address of

15 record."  Id. at 1122.

16    Rule 6 of the Federal Rules of Civil Procedure governs

17 the computation of the Title VII limitations period.  See id. at

18 1125.  Rule 6 provides that "if the last day [of the period] is a

19 Saturday, Sunday, or legal holiday, the period continues to run

20 until the end of the next day that is not a Saturday, Sunday, or

21 legal holiday."  Fed. R. Civ. P. 6(a)(1)(C).

22    It is undisputed that plaintiffs' counsel received the

23 right-to-sue letter on August 1, 2022.  (See Mot. at 15; Opp'n at

24 5.)  Ninety days from August 1, 2022 was Sunday, October 30,

25 

26    [7]    If an administrative agency does not bring suit on an
   aggrieved person's behalf, the agency issues a right-to-sue
27 letter notifying the individual that she can file suit.  See
   Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1104 (9th Cir.
28 2008).

1   2022.  "Because ninety days after that date was . . . a Sunday,

2   Federal Rule of Civil Procedure 6(a) extends the ninety-day

3   period" to the following Monday, October 31, 2022.  See Payan,

4   495 F.3d at 1125.  Plaintiffs' complaint was filed on October 31,

5   2022.  (See Docket No. 1-1.)  Accordingly, plaintiffs' Title VII

6   claims were timely filed.

7            2.   FEHA Claims

8            The time period for filing a FEHA claim expires "when

9   the federal right-to-sue period to commence a civil action

10  expires, or one year from the date of the right-to-sue notice by

11  the department, whichever is later."  See Cal. Gov. Code §

12  12965(d)(2).

13           Defendants state that plaintiffs received their right-

14  to-sue notices from the California Department of Fair Employment

15  and Housing on October 30, 2019 and November 5, 2019, which

16  plaintiffs do not dispute.  (See Mot. at 15; Opp'n at 6.)  One

17  year from these dates was October 29, 2020, and November 4, 2020,

18  respectively.  The FEHA filing period thus expired on the same

19  date as the Title VII filing period, October 31, 2022.

20  Plaintiff's FEHA claims were therefore timely filed.  (See Docket

21  No. 1-1.)

22           Accordingly, the court concludes that plaintiffs have

23  stated claims under Title VII and the FEHA, which were timely

24  filed and administratively exhausted.  Plaintiffs have also pled

25  sufficient facts to allege that the statute of limitations

26  applicable to the negligence claim was subject to equitable

27  tolling.  Plaintiffs have failed to state claims under the ADA

28  and § 1981.

1          IT IS THEREFORE ORDERED that defendants' motion to

2   dismiss (Docket No. 22) is GRANTED as to plaintiffs' § 1981 and

3   ADA claims in their entirety.  The motion to dismiss is denied in

4   all other respects.  Plaintiffs have twenty days from the date of

5   this Order to file an amended complaint, if they can do so

6   consistent with this Order.

7   Dated:  May 12, 2023

8                                WILLIAM B. SHUBB
9                                UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28