UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MARVONTE WILSON and DOMONIQUE
DANIELS, individually and on
behalf of all others similarly
situated,

               Plaintiffs,

    v.

TIMEC SERVICES COMPANY, INC.;
FERROVIAL SERVICES
INFRASTRUCTURE, INC.; VALERO
REFINING COMPANY-CALIFORNIA;
DISA GLOBAL SOLUTIONS; and DOES
1 through 50, inclusive,

               Defendants.

No. 2:23-cv-00172 WBS KJN


MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

----oo0oo----

       Plaintiffs Marvonte Wilson and Domonique Daniels
brought this putative class action in Solano County Superior
Court against Timec Services Company, Inc. ("Timec"); Ferrovial
Services Infrastructure, Inc. ("Ferrovial"); Valero Refining
Company-California ("Valero"); and DISA Global Solutions
("DISA").  Plaintiffs allege employment discrimination based on

1

race in violation of Title VII of the Civil Rights Act of 1964
("Title VII"), 42 U.S.C. § 2000e, and the California Fair
Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940; and
negligence under California law.  (Second Am. Compl. ("SAC")
(Docket No. 77).)  Defendant DISA now moves to dismiss the Second
Amended Complaint's employment discrimination claims (Docket No.
82), joined by defendants Timec, Ferrovial, and Valero (Docket
Nos. 83-85).

I.   Factual Background[1]

          Defendants Timec, Ferrovial, and Valero are businesses
in the refinery industry.  (SAC ¶¶ 8-9.)  At all relevant times,
Ferrovial owned Timec.[2]  (Id. ¶ 8.)

          Defendant DISA is a drug-testing company providing
services to hundreds of employers in the refining, chemical, and
petrochemical industries, including defendants Timec/Ferrovial
and Valero.  (Id. ¶¶ 10, 19.)  DISA operates the DISA
Contractor's Consortium ("DCC"), an online platform that provides
information about whether employees are compliant with DISA's
drug-testing policies.  (See id. ¶ 19.)  When an employee fails
to comply with DISA's drug-testing policies, he or she is
designated as "inactive" on DCC.  (Id.)  To regain "active"
status, employees must pay DISA to either take a retest or
complete a substance abuse course.  (See id.)  DISA uses a
variety of drug-testing methods, including urine, blood, and hair

---

          [1]   All facts recited herein are as alleged in the Second
Amended Complaint.

          [2]   The court will refer to Timec and Ferrovial as
"Timec/Ferrovial."

1  testing.  (Id.)

2        "Research has shown that hair drug tests
3  disproportionately result in false positives when processing the
4  type of hair common in Black people.  This is due to the chemical
5  and physical characteristics of Black peoples' hair, including
6  the texture and higher melanin content." (Id. ¶ 14.)  Scientific
7  studies show that black people's hair has a higher melanin
8  content than people of other races, including people of other
9  races with dark-colored hair.  (Id. ¶ 15.)  Black people also use
10  hair care products not commonly used by non-black people.  (Id. ¶
11  16.)  These characteristics cause black people's hair to react to
12  drugs differently, including those introduced by external
13  contamination, leading to a higher risk of false positive drug
14  test results.  (Id. ¶¶ 14-16.)  Plaintiff Wilson's DISA drug
15  testing records stated that because his hair is "[e]xtremely
16  curly," the hair "cannot be properly aligned and/or cut" for
17  testing purposes, which "may affect" the accuracy of the results.
18  (Id. ¶ 31.)

19        Plaintiffs Marvonte Wilson and Domonique Daniels are
20  black men.  (Id. ¶¶ 20, 35.)  Mr. Wilson was employed by
21  Timec/Ferrovial from 2016 to 2019.  (Id. ¶ 20.)  Mr. Daniels was
22  employed by Timec/Ferrovial from 2001 to 2019.  (Id. ¶ 35.)
23  Timec/Ferrovial placed plaintiffs at Valero's work sites.  (Id.
24  ¶¶ 21, 36.)  Valero required multiple types of drug tests,
25  including hair tests, which were administered by DISA.  (See id.
26  ¶¶ 22, 37.)

27        In January and February 2019, respectively, Mr. Daniels
28  and Mr. Wilson received positive hair test results for

3

methamphetamines and cocaine, respectively, despite never having used those drugs.  (Id. ¶¶ 25, 39.)  Mr. Daniels also received saliva and urine tests, which both came back negative for all drugs.  (Id. ¶ 25.)  Mr. Wilson received a urine test, which came back negative for all drugs.  (Id. ¶ 39.)  As a result of the false positive hair tests, DISA classified plaintiffs as "inactive" on the DCC platform.  (Id. ¶¶ 30, 40.)  When plaintiffs notified DISA that the results were false positives, DISA informed plaintiffs that they had two options: pay $175 for a retest of the same hair sample by DISA, or complete a substance abuse course administered by DISA at a cost ranging from $600 to $850.  (Id. ¶¶ 26, 39.)  Plaintiffs informed Timec/Ferrovial that the results were false positives, but Timec/Ferrovial told plaintiffs that they had to resolve the issue with DISA.  (Id. ¶¶ 26, 40.)

Mr. Wilson was terminated by Valero and informed that he could not return to work for Timec/Ferrovial until he regained active status.  (See id. ¶ 26.)  A retest of Mr. Wilson's original sample again came back with a false positive.  (Id. ¶ 29.)  Mr. Wilson refused to take the substance abuse course and did not again work for Timec/Ferrovial or Valero.  (Id. ¶ 30.)

Mr. Daniels inquired repeatedly with DISA about receiving a retest, but by the time DISA responded, the deadline for retesting had passed.  (Id. ¶ 41.)  During the time he was designative "inactive," Mr. Daniels was not allowed to work for either Timec/Ferrovial or Valero.  (Id.)  Mr. Daniels ultimately paid for and completed DISA's substance abuse course to regain his active status on DCC.  (Id.)  However, the jobs he

subsequently received were lower-ranking and paid less than his previous employment.  (Id. ¶ 42.)

II.  Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal when a complaint fails to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  "A Rule 12(b)(6) motion tests the legal sufficiency of a claim."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  The inquiry before the court is whether, accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the complaint has alleged "sufficient facts . . . to support a cognizable legal theory," id., and thereby stated "a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

III. Discussion

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."  Ricci v. DeStefano, 557 U.S. 557, 577 (2009).

FEHA makes it an "unlawful employment practice" to "discriminate against [an individual] in compensation or in terms, conditions, or privileges of employment" based on, inter

alia, race, color, or national origin.  See Cal. Gov't Code § 12940(a).  Because "FEHA uses largely the same language and promotes the same objective as Title VII . . . the Title VII framework is applied to claims brought under FEHA."  Pinder v. Emp. Dev. Dep't, 227 F. Supp. 3d 1123, 1136 (E.D. Cal. 2017) (Nunley, J.) (citing, inter alia, Metoyer v. Chassman, 504 F.3d 919, 941 (9th Cir. 2007); Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 354 (2000)).  See also Kohler v. Inter-Tel Techs., 244 F.3d 1167, 1172 (9th Cir. 2001) ("The California courts consistently look to Title VII for guidance in interpreting FEHA.")

A.   Disparate Impact Under Title VII and FEHA

Plaintiffs' first and second claims allege disparate impact under Title VII and FEHA.  To state a disparate impact claim, plaintiffs must plausibly allege that an employment disparity exists with respect to the protected group.  Liu v. Uber Techs. Inc., 551 F. Supp. 3d 988, 990 (N.D. Cal. 2021) (citing Freyd v. Univ. of Or., 990 F.3d 1211, 1224 (9th Cir. 2021)).  See also Guz, 24 Cal. 4th at 354 (a disparate impact claim alleges that an employment practice "in fact had a disproportionate adverse effect on members of the protected class").

Plaintiffs allege that defendants required negative hair drug tests as a condition of continued employment.  (See SAC ¶¶ 19, 26, 30, 37, 39.)  Plaintiffs further allege that hair drug tests, as compared with other types of available drug tests, are less accurate on black people's hair due to its unique melanin content, texture, and commonly used hair products.  (See id. ¶¶ 14-16.)  By alleging that hair drug testing is less effective on

black people compared to individuals of other races, plaintiffs
have sufficiently alleged that defendants' hair drug testing
requirement disparately impacts defendants' black employees.  See
Liu, 2022 WL 4494149, at *2 (where it is "plain" that an
employment policy would "disparately affect" a protected class,
the plaintiff need not allege "statistical or other evidence
about the results of that practice in the workplace").
Accordingly, the court will not dismiss plaintiffs' first and
second claims for disparate impact.

The court notes that its prior conclusion that hair
color alone was insufficient to support a claim of race
discrimination (see Docket No. 40 at 15-16) was based on the
allegations of the First Amended Complaint, which the court
understood to equate "melanin-rich" with all darker-colored hair.
The court's conclusion here differs because the Second Amended
Complaint provides further allegations concerning how black
people's melanin-rich hair differs in multiple ways.  Further,
the Second Amended Complaint also relies upon the unique texture
of black people's hair, which the court previously indicated can
serve as a proxy for race.  (See id. at 16 n.5.)

B.   Disparate Treatment Under Title VII and FEHA

Plaintiffs' third and fourth claims allege disparate
treatment under Title VII and FEHA.  Disparate treatment occurs
"where an employer has treated a particular person less favorably
than others because of a protected trait."  Ricci, 557 U.S. at
577 (internal quotation marks and alterations omitted).  "A
disparate-treatment plaintiff must establish that the defendant
had a discriminatory intent or motive for taking a job-related

1    action."  Id. (internal quotation marks omitted).  "A

2    discriminatory motive may be established by the employer's

3    informal decisionmaking or 'a formal, facially discriminatory

4    policy,' but 'liability depends on whether the protected trait .

5    . . actually motivated the employer's decision.'"  Wood v. City

6    of San Diego, 678 F.3d 1075, 1081 (9th Cir. 2012) (citing Hazen

7    Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).  See also Guz,

8    24 Cal. 4th at 354 n.20 (disparate treatment under FEHA is

9    "intentional discrimination against one or more persons on

10   prohibited grounds") (emphasis in original).  As such, a

11   plaintiff bringing a disparate treatment claim "must allege facts

12   that plausibly indicate defendant was 'motivated by a

13   discriminatory animus.'"  Anderson v. Yolo County, No. 2:16-cv-

14   2466 WBS DB, 2017 WL 590246, at *3 (E.D. Cal. Feb. 14, 2017)

15   (quoting Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30,

16   694 F.2d 531, 538 (9th Cir. 1982)).  See also Guz, 24 Cal. 4th at

17   323 (disparate treatment plaintiff must allege some "circumstance

18   suggest[ing] discriminatory motive").  Dismissal of a disparate

19   treatment claim is appropriate where discriminatory intent is

20   premised on an allegation that "'the employer was merely aware of

21   the adverse consequences the policy would have on a protected

22   group.'"  See Wood, 678 F.3d at 1081 (quoting Am. Fed'n of State,

23   Cnty., & Mun. Emps. v. Washington, 770 F.2d 1401, 1405 (9th Cir.

24   1985)).

25          Plaintiffs argue that they have stated a claim for

26   disparate treatment because the drug-testing policies at issue

27   are facially discriminatory.  In support of this argument,

28   plaintiffs point to the allegation that plaintiff Wilson's DISA

8

drug testing records stated that because his hair is "[e]xtremely curly," the hair "cannot be properly aligned and/or cut" for testing purposes, which "may affect" the accuracy of the results. (See SAC ¶ 31.)  However, a statement in one employee's drug testing records does not suggest that there was a facially discriminatory policy applicable to all employees.  Further, plaintiffs have not made any non-conclusory allegations that suggest discriminatory intent on the part of defendants. Accordingly, the court will dismiss plaintiffs' third and fourth claims for disparate treatment.  Because these claims were dismissed on the prior motion for the same reason and the Second Amended Complaint does not contain any additional allegations indicating intent, no further leave to amend will be granted.

IT IS THEREFORE ORDERED that defendants' motion to dismiss the Second Amended Complaint (Docket No. 82) be, and the same hereby is, GRANTED as to plaintiffs' third and fourth claims for disparate treatment, and DENIED in all other respects.

Dated: December 14,2023

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE